**Slip Op. 26-82**

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| GOVERNMENT OF CANADA, GOVERNMENT OF ALBERTA, GOVERNMENT OF QUÉBEC, BRITISH COLUMBIA LUMBER TRADE COUNCIL, FONTAINE, INC., INTERFOR CORPORATION, AND INTERFOR SALES & MARKETING, LTD., | |
| Plaintiffs, | |
| and | |
| CANFOR CORPORATION, CANADIAN FOREST PRODUCTS, LTD., CANFOR WOOD PRODUCTS MARKETING, LTD., COMMITTEE OVERSEEING ACTION FOR LUMBER INTERNATIONAL TRADE INVESTIGATIONS OR NEGOTIATIONS, TOLKO INDUSTRIES, LTD., TOLKO MARKETING & SALES, LTD., GILBERT SMITH FOREST PRODUCTS, LTD., RESOLUTE FP CANADA, INC., THE CONSEIL DE L'INDUSTRIE FORESTIERE DU QUÉBEC, AND THE ONTARIO FOREST INDUSTRIES ASSOCIATION, | Before: Jennifer Choe-Groves, Judge<br><br>Consol. Court No. 23-00187 |
| Consolidated Plaintiffs, | |

and

**CANFOR CORPORATION, CANADIAN FOREST PRODUCTS, LTD., CANFOR WOOD PRODUCTS MARKETING, LTD., GOVERNMENT OF ONTARIO, CARRIER FOREST PRODUCTS, LTD., CARRIER LUMBER, LTD., OLYMPIC INDUSTRIES, INC., OLYMPIC INDUSTRIES, ULC, WEST FRASER MILLS, LTD., CHALEUR FOREST PRODUCTS INC., CHALEUR FOREST PRODUCTS L.P., DELCO FOREST PRODUCTS LTD., DEVON LUMBER CO. LTD., H.J. CRABBE & SONS LTD., J.D. IRVING, LIMITED, LANGEVIN FOREST PRODUCTS, INC., MARWOOD LTD., NORTH AMERICAN FOREST PRODUCTS LTD., TWIN RIVERS PAPER CO. INC., AJ FOREST PRODUCTS, LTD., ER PROBYN EXPORT LIMITED, RAYONIER A.M. CANADA G.P., SCIERIE ALEXANDRE LEMAY & FILS, INC., AND CANADA G.P.,**

   **Plaintiff-Intervenors,**

**v.**

**UNITED STATES,**

   **Defendant,**

**and**

**COMMITTEE OVERSEEING ACTION FOR LUMBER INTERNATIONAL TRADE INVESTIGATIONS OR NEGOTIATIONS AND SIERRA PACIFIC INDUSTRIES,**

**Defendant-Intervenors.**

## OPINION AND ORDER

[Sustaining the U.S. Department of Commerce's Remand Redetermination.]

Dated: July 27, 2026

Eric S. Parnes, Joanne E. Osendarp, Lynn G. Kamarck, Alan G. Kashdan, Blank Rome LLP, of Washington, D.C., for Plaintiff Government of Canada.

Lynn M. Fischer Fox, Arnold & Porter Kaye Scholer LLP, of Washington, D.C., for Plaintiff-Intervenor Government of Alberta. Archana R. Vasa also appeared. Nancy Noonan, ArentFox Schiff LLP, of Washington, D.C., for Plaintiff-Intervenor Government of Québec. Harold D. Kaplan, Hogan Lovells US LLP, of Washington, D.C., for Plaintiff-Intervenor Government of Ontario. Jonathan T. Stoel also appeared. Amy J. Lentz, Steptoe LLP, of Washington, D.C., for Plaintiff-Intervenor British Columbia Lumber Trade Council. Stephanie W. Wang also appeared. Mark B. Lehnardt, Law Offices of David L. Simon, PLLC, of Washington, D.C., for Plaintiff-Intervenor Fontaine Inc. Diana Dimitriuc-Quaia, ArentFox Schiff LLP, of Washington, D.C., for Plaintiff-Intervenors Interfor Corporation, Interfor Sales and Marketing Ltd., Chaleur Forest Products, Inc., and Chaleur Forest Products, L.P. Mario A. Torrico and Matthew Mosher Nolan also appeared. Rudi W. Planert, Taft Stettinius & Hollister LLP, of Washington, D.C., for Plaintiff-Intervenors Canfor Corporation, Canadian Forest Products, Ltd., and Canfor Wood Products Marketing Ltd. Brady W. Mills, Donald B. Cameron, Jr., Edward J. Thomas, III, Eugene Degnan, Jordan L. Fleischer, Jr., Julie C. Mendoza, Mary S. Hodgins, and Nicholas C. Duffey, Jr. also appeared. Jay C. Campbell,

White & Case, LLP, of Washington, D.C., for Plaintiff-Intervenor J.D. Irving, Limited. Allison J. Gartner Kepkay and Walter J. Spak also appeared. Rajib Pal, Sidley Austin LLP, of Washington, D.C., for Plaintiff-Intervenors Delco Forest Products Ltd., Devon Lumber Co. Ltd., H.J. Crabbe & Sons Ltd., Langevin Forest Products Inc., Marwood Ltd., North American Forest Products Ltd., and Twin Rivers Paper Co. Inc. James E. Mendenhall also appeared.

Henry D. Almond, Arnold & Porter Kaye Scholer LLP, for Consolidated Plaintiffs Tolko Industries Ltd., Tolko Marketing & Sales Ltd., and Gilbert Smith Forest Products Ltd. Kang W. Lee also appeared. Elliot J. Feldman, Baker Hostetler LLP, of Washington, D.C., for Consolidated Plaintiffs Resolute FP Canada Inc., Conseil de l'industrie forestière du Québec, and Ontario Forest Industries Association. Michael S. Snarr, Ronald J. Baumgarten, Jr., and Tung A. Nguyen also appeared. Kristin H. Mowry, Mowry & Grimson, PLLC, of Washington, D.C., for Consolidated Plaintiffs Carrier Forest Products Ltd., Carrier Lumber Ltd., Olympic Industries, Inc., and Olympic Industries ULC. Jeffrey S. Grimson, Bryan P. Cenko, Jill A. Cramer, Ronalda G. Smith, Sarah M. Wyss, and Yixin (Cleo) Li also appeared. Donald Harrison, Gibson, Dunn & Crutcher, LLP, of Washington, D.C., for Consolidated Plaintiff West Fraser Mills Ltd.

Douglas G. Edelschick, Senior Trial Counsel, Brett A. Shumate, Assistant Attorney General, Patricia M. McCarthy, Director, and Claudia Burke, Deputy Director, Commercial Litigation Branch, U.S. Department of Justice, for Defendant United States. Of counsel on the brief was Vania Wang, Senior Counsel, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Andrew W. Kentz, Whitney M. Rolig, Zachary J. Walker, and J. Daniel Stirk, Picard Kentz & Rowe LLP, of Washington, D.C., for Defendant-Intervenor Committee Overseeing Action for Lumber International Trade Investigations or Negotiations. David J. Ross and Stephanie E. Hartmann, Wilmer Cutler Pickering Hale and Dorr LLP, of Washington, D.C., for Defendant-Intervenor Sierra Pacific Industries including its subsidiary Seneca Sawmill Company.

Choe-Groves, Judge: This action concerns the final determination published by the U.S. Department of Commerce ("Commerce") in the antidumping duty investigation on certain softwood lumber products from Canada. See Certain

Softwood Lumber Products From Canada ("Final Determination"), 88 Fed. Reg.

50,106 (Dep't of Commerce Aug. 1, 2023) (final results of antidumping duty

administrative review and final determination of no shipments; 2021); see also

Issues and Decision Memorandum for the Final Results of the 2021 Administrative

Review of the Antidumping Duty Order on Certain Softwood Lumber Products

from Canada (July 26, 2023) ("Final IDM"), ECF No. 76-5.

Before the Court is Commerce's Remand Redetermination, filed pursuant to

the Court's remand order following the U.S. Court of Appeals for the Federal

Circuit's ("CAFC") opinion in Marmen Inc. v. United States ("Marmen III"), 134

F.4th 1334 (Fed. Cir. 2025).  See Order (June 17, 2025), ECF No. 160; Final

Results of Redetermination Pursuant to Court Remand ("Remand

Redetermination"), ECF No. 175-1, PRR 6;[1] see also Marmen Inc. v. United States

("Marmen I"), 45 CIT __, 545 F. Supp. 3d 1305 (2021); Marmen Inc. v. United

States ("Marmen II"), 47 CIT __, 627 F. Supp. 3d 1312 (2023); Marmen Inc. v.

United States ("Marmen IV"), 50 CIT __, No. 20-00169, 2026 WL 1726609 (CIT

June 15, 2026).

For the following reasons, the Court sustains the Remand Redetermination.

---

[1] Citations to the administrative record reflect the public remand record ("PRR") document numbers filed in this case, ECF No. 187.

## BACKGROUND

In March 2022, Commerce initiated an administrative review of the antidumping duty on softwood lumber from Canada for the period of January 1, 2021, to December 31, 2021.  Initiation of Antidumping and Countervailing Duty Administrative Reviews, 87 Fed. Reg. 13,252 (Dep't of Commerce March 9, 2022).  In the Final Determination, Commerce assigned weighted-average dumping margins of 5.25% to Canfor Corporation, Canadian Forest Products Ltd., and Canfor Wood Products Marketing Ltd. (collectively, "Canfor"), 6.96% to West Fraser Mills Ltd., Blue Ridge Lumber Inc., Manning Forest Products Ltd., and Sundre Forest Products Inc. (collectively, "West Fraser"), and 6.20% to the non-selected companies.  88 Fed. Reg. at 50,107.  Commerce utilized the Cohen's $d$ test in its differential pricing analysis to calculate the dumping margins.  Final IDM at 18.  In Marmen III, the CAFC vacated and remanded Marmen II for Commerce to fashion a differential pricing analysis that did not rely on the Cohen's $d$ test.  134 F.4th at 1343–48.  After the Court remanded this case for further compliance with the CAFC's mandate in Marmen III, Commerce discontinued its use of the Cohen's $d$ test and reformulated its differential pricing analysis to consist of three steps: (1) a new "price difference test" in place of the prior Cohen's $d$ test; (2) the "ratio test;" and (3) the "meaningful difference test."  Remand Redetermination at 2–7.  With this new analysis, Commerce revised the margin calculations for Canfor

and West Fraser, which resulted in minimal changes to the revised weighted-average dumping margins calculated for the mandatory and non-selected respondents.[2] Id. at 2.

## JURISDICTION

The Court has jurisdiction under 19 U.S.C. § 1516a(a)(2)(B)(i) and 28 U.S.C. § 1581(c), which grant the Court authority to review actions contesting the final determination in an antidumping duty investigation. The Court shall hold unlawful any determination found to be unsupported by substantial evidence on the record or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i). The Court also reviews determinations made on remand for compliance with the Court's remand order. Ad Hoc Shrimp Trade Action Comm. v. United States ("Ad Hoc Shrimp"), 38 CIT 727, 730, 992 F. Supp. 2d 1285, 1290 (2014), aff'd, 802 F.3d 1339 (Fed. Cir. 2015).

## DISCUSSION

To comply with the CAFC's opinion in Marmen III, Commerce discontinued its use of the Cohen's $d$ test and replaced it with a new "price difference test" for evaluating whether price differences are significant among purchasers, regions, or time periods, which is the first step of Commerce's

---

[2] Commerce determined that the revised weighted-average dumping margins were 5.25% for Canfor, 7.06% for West Fraser, and 6.26% for the non-selected parties. Remand Redetermination at 2.

differential pricing analysis.  Remand Redetermination at 3.  Commerce adopted

the "price difference test" as step one of its differential pricing analysis in the

Remand Redetermination as follows:

> The differential pricing analysis used in these final results of redetermination examines whether there exists a pattern of prices for comparable merchandise that differ significantly among purchasers, regions, or time periods.  The analysis evaluates all U.S. sales by purchaser, region, and time period to determine whether a pattern of prices that differ significantly exists.  If such a pattern is found, then the differential pricing analysis evaluates whether such differences can be taken into account when using the A-to-A method to calculate the weighted-average dumping margin.  The analysis incorporates default group definitions for purchasers, regions, time periods, and comparable merchandise.  Purchasers are based on the reported consolidated customer codes.  Regions are defined using the reported destination code (*i.e.*, ZIP code) and are grouped into regions based upon standard definitions published by the U.S. Census Bureau.  Time periods are defined by the quarter within the POR based upon the reported date of sale.  For purposes of analyzing sales transactions by purchaser, region, and time period, comparable merchandise is defined using the product control number (CONNUM) and all characteristics of the U.S. sales, other than purchaser, region, and time period, that Commerce uses in making comparisons between EP (or CEP) and NV for the individual dumping margins.

> In the first stage of the differential pricing analysis used in these final results of redetermination, the "price difference test" is applied to determine whether prices differ significantly.  For comparable merchandise, the price difference test examines whether the weighted-average net price to a given purchaser, region, or time period is within two percent of the weighted-average net price to all other purchasers, regions, or time periods.  If the weighted average net price to the given purchaser, region, or time period falls outside of the plus or minus two percent band around the weighted-average net price to all other purchasers, regions, or time periods, then the prices to that given purchaser, region, or time period are found to differ significantly and

those sales to the given purchaser, region, or time period pass the price difference test.

Next, the "ratio test" assesses the extent of the significant price differences for all U.S. sales as measured by the price difference test. The ratio test calculates the ratio of the total value of sales that pass the price difference test to the total value of sales by the respondent in the United States during the [period of review]. If 33 percent or less of the total value of sales passes the price difference test, then the results of the price difference and ratio tests do not support consideration of the A-to-T method. If more than 33 percent of the total value of U.S. sales passes the price difference test, then Commerce will find that a pattern of prices existed during the [period of review]. Consequently, Commerce will examine whether there is a meaningful difference in the weighted-average dumping margins calculated using the standard A-to-A method and using the alternative A-to-T method.

If both tests in the first stage (*i.e.*, the price difference test and the ratio test) demonstrate the existence of a pattern of prices that differ significantly such that the A-to-T method should be considered, then in the second stage of the differential pricing analysis, Commerce examines whether using only the A-to-A method can account for such differences. In considering this question, Commerce examines whether using the A-to-T method yields a meaningful difference in the weighted-average dumping margin as compared to that resulting from the use of the A-to-A method. If the difference between the two calculations is meaningful, then this demonstrates that the A-to-A method cannot account for differences in the respondent's pricing behavior in the U.S. market, such as those observed in this analysis, and, therefore, use of the A-to-T method may be appropriate. A difference in the weighted-average dumping margins is considered meaningful if: (1) there is a 25 percent relative change in the weighted-average dumping margins between the A-to-A method and the A-to-T method where both rates are above the *de minimis* threshold; or (2) the resulting weighted-average dumping margins between the A-to-A method and the A-to-T method move across the *de minimis* threshold.

Id. at 5–7.

Commerce determined that 99.40% of the value of U.S. sales for

Canfor passed the price difference test and 99.82% for West Fraser. Id. at 7.

Commerce determined that these percentages confirmed the existence of a

pattern of prices that differed significantly among purchasers, regions, or

time periods. Id. In the Remand Redetermination, Commerce determined

that the A-to-A method could not account for such differences "because the

weighted-average dumping margin [crossed] the *de minimis* threshold when

calculated using the A-to-A method and when calculated using the

alternative A-to-T method." Id. Accordingly, Commerce applied the A-to-T

method to calculate the weighted-average dumping margins for both Canfor

and West Fraser. Id.

## I.      Reasonableness of Commerce's Differential Pricing Analysis

First, Plaintiff Canadian Parties[3] (collectively, "Plaintiffs") argue that

the correct standard of review for Commerce's interpretation of 19 U.S.C.

_____

[3] The Plaintiff Canadian Parties include "the Government of Canada; the Governments of Alberta, Ontario, and Québec; the British Columbia Lumber Trade Council, Conseil de l'industrie forestière du Québec, and Ontario Forest Industries Association; as well as Canfor Corporation, Canadian Forest Products, Ltd., Canfor Wood Products Marketing Ltd., Carrier Forest Products Ltd., Carrier Lumber Ltd., Olympic Industries Inc., Olympic Industries ULC, Fontaine, Inc., Interfor Corporation, Interfor Sales & Marketing Ltd., Resolute FP Canada Inc., Tolko Industries Ltd., Tolko Marketing & Sales Ltd., Gilbert Smith Forest Products Ltd., West Fraser Mills Ltd., Chaleur Forest Products, Inc., Chaleur Forest Products, L.P., J.D. Irving, Limited, Delco Forest Products, Ltd., Devon Lumber Co., Ltd., H.J. Crabbe & Sons, Ltd., Langevin Forest Products, Inc.,

§ 1677f-1(d)(1)(B), and thus Commerce's differential pricing analysis, is not reasonableness but whether the interpretation is the "best reading" of the statute in light of Loper Bright Enters. v. Raimondo ("Loper Bright"), 603 U.S. 369 (2024).  Pl. Canadian Parties' Am. Comments Opp'n Final Results Remand Redetermination ("Pls.' Br.") at 4–6, ECF No. 190, 191.  Defendant United States ("Defendant" or "Government") claims that the standard of review for Commerce's differential pricing analysis is reasonableness, and notes the CAFC's use of the reasonableness standard after Loper Bright in Marmen III when reviewing the analysis.  Def.'s Resp. Comments Dep't Commerce Remand Redetermination ("Def.'s Br.") at 10, ECF No. 184 (citing Marmen III, 134 F.4th at 1348).

The relevant standard for reviewing Commerce's selection of statistical tests and numerical cutoffs is reasonableness.  See Stupp Corp. v. United States ("Stupp"), 5 F.4th 1341, 1353 (Fed. Cir. 2021) ("Our precedents make clear that the relevant standard for reviewing Commerce's selection of statistical tests and numerical cutoffs is reasonableness, not substantial evidence.") (citing Mid Continent Steel & Wire, Inc. v. United States, 940 F.3d 662, 667 (Fed. Cir. 2019) ("In carrying out its statutorily assigned tasks, Commerce has discretion to make

---

Marwood, Ltd., North American Forest Products, Ltd., and Twin Rivers Paper Co."  Pls.' Br. n.1.

reasonable choices within statutory constraints."); Apex Frozen Foods Priv. Ltd. v.

United States ("Apex Frozen Foods"), 862 F.3d 1337, 1346 (Fed. Cir. 2017)

(holding Commerce's "meaningful difference" test to be "reasonable")).  Further,

the CAFC applied a "reasonableness" standard in evaluating whether it was

"unreasonable for Commerce to use [the] Cohen's *d* test as part of its differential

pricing analysis[.]"  Marmen III, 134 F.4th at 1345.  Accordingly, the Court

reviews Commerce's Remand Redetermination and its "price difference test"

under the reasonableness standard.

Commerce shall determine whether subject merchandise is being sold at less

than fair value:

> (i) by comparing the weighted average of the normal values to the
> weighted average of the export prices (and constructed export prices)
> for comparable merchandise, or
>
> (ii) by comparing the normal values of individual transactions to the
> export prices (or constructed export prices) of individual transactions
> for comparable merchandise.

19 U.S.C. § 1677f-1(d)(1)(A).  Section 1677f-1(d)(1)(B) provides an exception,

when Commerce:

> may determine whether the subject merchandise is being sold in the
> United States at less than fair value by comparing the weighted average
> of the normal values to the export prices (or constructed export prices)
> of individual transactions for comparable merchandise, if—
>
> (i) there is a pattern of export prices (or constructed export prices) for
> comparable merchandise that differ significantly among purchasers,
> regions, or periods of time, and

(ii) the administering authority explains why such differences cannot be taken into account using a method described in paragraph (1)(A)(i) or (ii).

Id. at § 1677f-1(d)(1)(B).

Congress implemented subsection (d) to address the concern that the A-to-A method for calculating dumping margins "could conceal 'targeted dumping.'" Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103–316, vol. 1 at 842–83 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4177–78 ("SAA").  Under subsection (d), Commerce is allowed to calculate dumping margins using the A-to-T method in situations when the A-to-A method "cannot account for a pattern of prices that differ significantly among purchasers, regions, or time periods, i.e., where targeted dumping may be occurring[,]" but only after Commerce first "establish[es] and provide[s] an explanation why it cannot account for such differences through the use of [the A-to-A method]." Id. at 4178 (emphasis omitted).  The SAA provides that "Commerce will proceed on a case-by-case basis, because small differences may be significant for one industry or one type of product, but not for another." Id.  "The rationale behind that statutory exception is that targeted dumping is more likely to be occurring when export prices fit a pricing model that differs significantly among different periods of time, different purchasers, or different regions of the United States." Stupp, 5 F.4th at 1345 (citing Apex Frozen Foods, 862 F.3d at 1347).

Plaintiffs claim that the "price difference test" is an unreasonable and erroneous interpretation of the statutory language of "differ significantly." Pls.' Br. at 6. By considering a significant price difference to be prices that differ by more than 2%, Plaintiffs claim that this interpretation of the statute ignores the context in which prices exist. Id. at 6–9. Plaintiffs argue that a context-sensitive assessment is what the plain language of the statute requires and Commerce's "two percent or more" interpretation is inflexible. Id. at 8–9. In the Remand Redetermination, Commerce explained that:

> Commerce's "price difference test" examines whether the weighted-average net price to a given purchaser, region, or time period is within two-percent of the weighted-average net price to all other purchasers, regions or time periods. Thus, whether the prices to a given purchasers, regions and time periods differ significantly is determined relative to the weighted-average net price to all other purchasers, regions or time periods. As a result, the data on which Commerce relies in performing the price difference test changes on a case-by-case basis, *i.e.*, specific to the respondent's pricing of comparable merchandise to all other purchasers, regions or time periods, and Commerce's analysis therefore conforms with Congress' intent that an analysis of whether a pattern of prices exists be carried out on a case-by-case basis.

Remand Redetermination at 16. Commerce justified applying this *de minimis* standard because a 2% threshold is used by Commerce in other contexts. Id. at 12–15 (referring to the arm's-length test under 19 C.F.R.§ 351.403(c) and the *de minimis* threshold for estimated weighted-average dumping margins under 19 U.S.C. §§ 1673b(b)(3), 1673d(a)(4)).

Defendant claims that the statute is written in general terms, which offers Commerce flexibility and the discretion to determine the implementation of the statute's elements. Def.'s Br. at 11. Defendant-Intervenors agree that the open-ended term "significantly" affords Commerce flexibility and refer to the Court's conclusions on Commerce's discretion in Garg Tube Export LLP v. United States, 48 CIT __, 740 F. Supp. 3d 1355 (2024). Comments Comm. Overseeing Action Lumber Int'l Trade Invest. Negots. Sierra Pacific Indus. Support Final Results Remand Redetermination ("Def.-Intervs.' Br.") at 12, ECF No. 185.

Plaintiffs argue additionally that the legislature's case-by-case basis directive[4] is not honored in Commerce's 2% threshold and that Commerce rejected previously a 2% test of this nature. Pls.' Br. at 11, 13. Plaintiffs note that in a previous case, Commerce rejected the 2% test and explained that such a brightline threshold ". . . does not account for price variations specific to the market in question." Id. at 13 (quoting Certain Steel Nails from the United Arab Emirates, 73 Fed. Reg. 33,985 (Dep't of Commerce June 16, 2008) (notice of final determination of sales at not less than fair

---

[4] "[I]n determining whether a pattern of significant price differences exist[,] Commerce will proceed on a case-by-case basis, because small differences may be significant for one industry or one type of product, but not for another." SAA at 842–83,1994 U.S.C.C.A.N. at 4178.

value); Issues and Decision Memorandum for the Final Determination in the Less-Than-Fair-Value Investigation of Certain Steel Nails from the United Arab Emirates (UAE), A-520-802, (June 16, 2008)).  Commerce explained that the "Nails Test" referred to by Plaintiffs was derived from the P/2 test, and was replaced with a methodology called the "differential pricing analysis."  Remand Redetermination at 19–21.  "The only common aspect of the P/2 test and the price difference test is the two percent threshold."  Id. at 22.[5]

The CAFC has affirmed Commerce's use of the *de minimis* threshold in another part of the differential pricing test, the "meaningful difference test."  See Apex Frozen Foods, 862 F.3d at 1346 ("[W]e agree that the difference in the actual antidumping rates that would be assessed—below *de minimis* when calculated with the [A-to-A] methodology; above *de minimis* when calculated using an alternative methodology—indeed informs the question of whether the [A-to-A] methodology can adequately account for a pattern of significant price differences 'because [A-to-A] masked the dumping that was occurring as revealed by the [A-to-T] calculated

---

[5] "However, the P/2 test only examines whether prices to alleged 'targets' are at least two percent lower than the prices for all other sales, whereas the price difference test considers whether prices to each purchaser, region, or time period are at least two percent higher or lower than the prices for all other sales."  Remand Redetermination at 22.

margin.'"") (quoting <u>Apex Frozen Foods Priv. Ltd. v. United States</u>, 40 CIT

__, __, 144 F. Supp. 3d 1308, 1333 n.24 (2016)).  Based upon the

explanation offered by Commerce in the <u>Remand Redetermination</u> and the

CAFC's Opinion in <u>Marmen III</u>, the Court concludes that Commerce's

adoption of the 2% threshold in the first stage of its differential pricing

analysis in the new "price difference test" is reasonable and complies with

<u>Marmen III</u>.

　　　Plaintiffs claim that Commerce failed to provide an adequate

explanation for its determination regarding significant price differences.

Pls.' Br. at 16.  Plaintiffs argue that evidence confirms that prices in the U.S.

softwood lumber market are volatile and subject to changes over time, which

are outside of the respondents' control.  <u>Id.</u> at 18.  Plaintiffs aver that

substantial evidence does not support treating time-based price differences

as prices that differ significantly among purchasers and regions, and that

using the 2% threshold for determining significant differences in price is

irrational when price differences within comparison groups frequently

exceed the threshold.  <u>Id.</u> at 18–19.  Market-specific evidence of price

volatility "dispels the notion that targeted dumping is occurring at all,"

according to Plaintiffs.  <u>Id.</u> at 21 (emphasis omitted).  Additionally, Plaintiffs

claim that after identifying whether conditions indicate masked dumping,

Commerce believes that it has no obligation to address evidence that those

conditions do not indicate masked dumping. Id. at 19. Plaintiffs state that

nearly 90% of Commerce's applications pass the price difference and ratio

tests, indicating conditions that may indicate masked dumping. See id.

The Remand Redetermination states that Commerce is not required to

consider whether market prices are the reason for significant price

differences between purchasers, regions, and time periods in accordance

with JBF RAK LLC v. United States ("JBF RAK"), 790 F.3d 1358 (Fed.

Cir. 2015). See Remand Redetermination at 17–19.[6] Plaintiffs argue that

JBF RAK did not release Commerce from the requirement of Section 1677f-

1(d)(1)(B)(ii) to explain why the A-to-A method cannot account for

observed price differences. Pls.' Br. at 30. Commerce explained that a

pattern of prices that differ significantly may indicate masked dumping and

that the meaningful difference test is what measures the amount of masked

---

[6] In JBF RAK LLC, the CAFC concluded that: "Section 1677f–1(d)(1)(B) does not require Commerce to determine the reasons why there is a pattern of export prices for comparable merchandise that differs significantly among purchasers, regions, or time periods, nor does it mandate which comparison methods Commerce must use in administrative reviews. As a result, Commerce looks to its practices in antidumping duty investigations for guidance. Here, the CIT did not err in finding there is no intent requirement in the statute, and we agree with the CIT that requiring Commerce to determine the intent of a targeted dumping respondent 'would create a tremendous burden on Commerce that is not required or suggested by the statute.'" (internal quotation marks and citation omitted). 790 F.3d at 1368.

dumping that the A-to-A method cannot account for.  Remand

Redetermination at 24.

Moreover, Plaintiffs argue that, when applied to the results of

Commerce's "price difference test," the ratio test does not faithfully interpret

the statutory pattern requirement.  Pls.' Br. at 22.  Defendant argues that

Plaintiffs' contentions with the ratio test are unsupported given that the ratio

test is lawful and has been sustained by the CAFC.  Def.'s Br. at 25.

Defendant-Intervenors also note that the language of 19 U.S.C § 1677f-

1(d)(1)(B)(i) does not direct Commerce on how it should determine whether

there are patterns of export prices for comparable merchandise that differ

significantly among purchasers, regions, and periods of time.  Def.-Intervs.'

Br. at 18.  Commerce adequately explained how its methodology was

reasonable, and the Court holds that Commerce's application of the "price

difference test" to determine whether there is a pattern of prices for

comparable merchandise that differ significantly among purchasers, regions,

or time periods, applied as a component of its differential pricing analysis, is

in accordance with law.

Plaintiffs argue that Commerce unlawfully altered the ratio test when

Commerce abandoned its mixed methodology on remand as well.  Pls.' Br.

at 26.  The Remand Redetermination explained that the statute does not

require Commerce to use a "mixed" method as an alternative comparison methodology. Remand Redetermination at 28. In Marmen III, the CAFC concluded that, on remand:

> Commerce may re-perform a differential pricing analysis, and that analysis may not rely on [the] Cohen's $d$ test for data sets like those here. This conclusion, of course, does not preclude Commerce from fashioning and justifying a statistical analysis that uses some of the ideas underlying Cohen's analysis of group differences as long as the resulting analysis is itself justified as sound for gauging differences in the data sets at issue.

134 F.4th at 1348. Commerce stated that "[w]hile the statute permits Commerce's previous policy that adopted a hybrid version of two available comparison methodologies," Section 1677f-1(d)(1)(B) "permits Commerce to use the A-to-T method when certain conditions . . . are satisfied." Remand Redetermination at 28.

Section 1677f-1(d)(1)(B) provides that Commerce may apply the A-to-T method, rather than the A-to-A method, if there is a pattern of export prices that differ significantly among purchasers, regions, or periods of time, so long as Commerce "explains why such differences cannot be taken into account using a method described in paragraph (1)(A)(i) or (ii)." 19 U.S.C. § 1677f-1(d)(1)(B). The exception in Section 1677f-1(d) refers to determining margins through the A-to-A methodology or the A-to-T methodology and makes no reference to a "mixed method" when Commerce

applies both.  See id. § 1677f-1(d).  This absence of statutory language referring to a mixed method supports Commerce's determination to discontinue the use of its "mixed method."  Additionally, the SAA refers to the use of one methodology over the other, but makes no reference to the simultaneous application of the A-to-A method and the A-to-T method.  See SAA at 842–843, 1994 U.S.C.C.A.N. at 4178.[7]

Relying on the statutory language and the legislative history, the Court concludes that Commerce permissibly revised its differential pricing analysis to discontinue use of the "mixed method" and to apply the "ratio test" in accordance with Marmen III.  The Court observes that the CAFC has previously upheld the "ratio test" as a reasonable method for Commerce to implement the statutory requirement to determine whether there is a pattern of export prices that differ significantly among purchasers, regions, or periods of time.  Stupp, 5 F.4th at 1355.  The Court concludes that Commerce provided a reasonable explanation for abandoning the "mixed method" and applying the "ratio test," and that Commerce complied with the CAFC's Opinion in Marmen III.  Ad Hoc Shrimp, 38 CIT at 730, 992 F.

---

[7] "New section 777A(d)(1)(B) provides for a comparison of average normal values to individual export prices or constructed export prices in situations where an [A-to-A] or [T-to-T] methodology cannot account for a pattern of prices that differ significantly among purchasers, regions, or time periods, i.e., where targeted dumping may be occurring."  SAA at 843, 1994 U.S.C.C.A.N. at 4178.

Supp. 2d at 1290.  Because Commerce adequately explained how its

methodology was reasonable, the Court holds that Commerce's application

of the "ratio test" to determine the extent of the significant price differences

of all U.S. sales as measured by the "price difference test" applied as a

component of its differential pricing analysis is in accordance with law.

Additionally, Plaintiffs contend that Commerce failed to satisfy the

statutory requirement to reasonably explain why the A-to-A method could

not account for time-based price differences and that simple margin

comparisons cannot explain why such differences cannot be accounted for

by the A-to-A method.  Pls.' Br. at 28.  Commerce reasoned that:

> The meaningful difference test quantifies the amount of masked dumping that remains hidden in the calculation of the weighted-average dumping margin using the A-to-A method.  When Commerce finds that the magnitude of the masked dumping meaningfully changes the calculated results using the A-to-A method, then it concludes that the A-to-A method cannot account for these prices differences and it may resort to the alternative A-to-T method.  The A-to-T method is the alternative provided for in the statute by which Commerce may address masked, or "targeted," dumping, where lower U.S. prices are offset by higher U.S. prices.

Remand Redetermination at 31.  Commerce accomplished the "meaningful

difference test" by examining whether "the A-to-T method yields a

meaningful difference in the weighted-average dumping margin as

compared to that resulting from the use of the A-to-A method."  Id. at 6.  A

difference in the weighted-average dumping margins is considered

"meaningful" if: "(1) there is a 25 percent relative change in the weighted average dumping margins between the A-to-A method and the A-to-T method where both rates are above the *de minimis* threshold; or (2) the resulting weighted-average dumping margins between the A-to-A method and the A-to-T method move across the *de minimis* threshold." Id. at 6–7.

In summary, Commerce conducted the differential pricing analysis here in three steps: the new "price difference test," the "ratio test," and the "meaningful difference test." The CAFC has held previously that Commerce's "ratio test" "reasonably implements the statutory requirement that Commerce determine whether there is a 'pattern of export prices' 'differ[ing] significantly among purchasers, regions, or periods of time' before selecting the [A-to-T]." Stupp, 5 F.4th at 1355 (alteration in original) (quoting 19 U.S.C. § 1677f-1(d)(1)(B)(i)). The CAFC reasoned that the "ratio test" is a "conventional method for quantifying comparisons across discrete groups: counting the number of divergent sales prices, as identified by an effect-size test, and calculating the population percentage of those divergent sales prices." Id. at 1354. The CAFC further held that Commerce's selection of the 33% and the 66% cutoffs in the "ratio test" is reasonable. Id. at 1354–55. The CAFC has also held that the "meaningful difference test," step three of the differential pricing analysis, is reasonable. Id. at 1356 (citing Apex Frozen Foods, 862 F.3d at 1348–49); see also Toyo Kohan Co.,

Ltd. v. United States, 50 CIT __, Slip Op. 26-54 (May 22, 2026) (sustaining

Commerce's differential pricing analysis using the new "price difference test"

instead of the Cohen's *d* test after Marmen III); Marmen IV, 50 CIT __, No. 20-

00169, 2026 WL 1726609.

With respect to the new "price difference test" that replaced the Cohen's

*d* test and is the first step in Commerce's differential pricing analysis, Commerce

explained that the "price difference test" is intended to determine whether prices

differ significantly among purchasers, regions, or time periods. Remand

Redetermination at 22. Commerce stated that if average prices to an affiliated

customer differ by at least 2% from market prices, then Commerce considers that

2% threshold to be a significant difference. Id. at 13–14. As noted above, the

CAFC in Stupp held that Commerce's selection of statistical tests and numerical

cutoffs must be reasonable. Stupp, 5 F.4th at 1353.

In Commerce's new "price difference test," Commerce determined that a 2%

difference in pricing would be considered significant. Because Commerce applied

the new "price difference test" on a case-by-case basis and determined that 99.40%

of the value of U.S. sales for Canfor and 99.82% for West Fraser passed the "price

difference test," Commerce reasonably determined that prices differed

significantly. Remand Redetermination at 7. Accordingly, the Court concludes

that Plaintiffs' arguments that the "price difference test" is inconsistent with the

best reading of the statute and fails to satisfy Congress' intent for a case-by-case differential pricing analysis thereby producing arbitrary results, are not persuasive.

Moreover, Plaintiffs' argument that Commerce arbitrarily and capriciously abandoned the mixed methodology is not persuasive. Pls.' Br. at 26. The CAFC stated in <u>Marmen III</u> that Commerce could revisit its differential pricing analysis, which is what Commerce did on remand in this case. <u>Marmen III</u>, 134 F.4th at 1348 ("Commerce may re-perform a differential pricing analysis[.]"). Commerce's determination to alter its "mixed method" within its differential pricing analysis was reasonable when refashioning a new analytical framework to implement 19 U.S.C. § 1677f-1(d)(1)(B).

The Court concludes that Commerce's <u>Remand Determination</u> was reasonable and sustains the differential pricing analysis.

**CONCLUSION**

For the foregoing reasons, Commerce's <u>Remand Redetermination</u> is sustained.

Judgment will be entered accordingly.

<u>  /s/ Jennifer Choe-Groves   </u><br>
Jennifer Choe-Groves, Judge

Dated:  <u>   July 27, 2026     </u>
       New York, New York